**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TIFFANY FENTERS,<br><br><br>              Plaintiff,<br><br>     vs.<br><br>YOSEMITE CHEVRON, et al.,<br><br>          Defendants. | No. CV-F-05-1630 OWW/DLB<br><br>MEMORANDUM DECISION GRANTING DEFENDANTS FUNG AND CASSABON & ASSOCIATES, LLP'S MOTION FOR SUMMARY JUDGMENT (Doc. 120) |

     Defendants Victor Fung and Cassabon & Associates, LLP (hereafter "the Cassabon Defendants") move for summary judgment in connection with Plaintiff Tiffany Fenters' allegations against them.

     In the First Amended Complaint (FAC), Tiffany names as defendants Yosemite Chevron, Abbco Investments, LLC, and Robert Abbate (the Abbate Defendants); Gordon Spencer, former District Attorney for the County of Merced, Merle Wayne Hutton, Supervising Investigator for the District Attorney's Office for Merced County, and Merced County (the Merced County Defendants);

1

and Victor K. Fung, CPA and Cassabon & Associates (the Cassabon Defendants).[1]  The FAC alleges that the Abbate Defendants and the Cassabon Defendants are "liable under federal law based on the joint activity and/or conspiracy [they] engaged in ... with individuals action under color of law and within the course and scope of their duties."

A.  <u>ALLEGATIONS OF FIRST AMENDED COMPLAINT</u>.

The FAC alleges that Tiffany was hired by Yosemite Chevron on June 6, 2002 as a cashier/stock clerk; that Tiffany was instructed to balance the cash register and clear the register of any cash in excess of $150 at the end of her shift; that, shortly after beginning her employment, she and other employees were required, as a condition of continued employment, to reimburse Yosemite Chevron for funds lost as a result of "drive-offs" where customers did not pay in advance and drove off without payment; that Tiffany was not being paid extra for overtime worked; that another Yosemite Chevron employee expressed inappropriate and unwelcome sexual interest in Tiffany; that when Tiffany brought this to Abbate's and Yosemite Chevron's management, no effective remedial action was taken; that other inappropriate conduct occurred at Yosemite Chevron, including theft and drug dealing; that Tiffany complained about being required to reimburse Yosemite Chevron for "drive-offs" and other defalcations, not

---

[1]The FAC also named Erin M. McIlhatton, CPA, of Cassabon & Associates as a Defendant.  McIlhatton was dismissed with prejudice by Stipulation and Order filed on October 10, 2007.  (Doc. 109)

being paid overtime, being forced to work overtime against her will, being sexually harassed, workplace theft, and working in a place where drugs were being used; that Tiffany left her employment with Yosemite Chevron on March 26, 2003 because of this ongoing pattern of illegal activity and misconduct; that Tiffany was forced to return to Yosemite Chevron without compensation to put her decision to quit in writing; and that Tiffany was not paid all of the compensation to which she was then legally entitled.   The FAC alleges:

> 23.   In connection with Tiffany's separation from employment in March 2003, Abbate went to the Office of the District Attorney for the County of Merced and met with Spencer and Hutton in an effort to get false and fabricated charges of embezzlement filed against Tiffany.   Indeed, neither Abbate nor anyone else at Yosemite Chevron had even suspected or accused Tiffany of any dishonest activity during her employment, and Abbate never reported any loss based on Tiffany's activities to his insurance, because, plaintiff is informed and believes, such losses did not occur and could not be credibly documented.   Tiffany is informed and believes that Abbate took this step as a 'preemptive strike' against her as an ex-employee he anticipated might take legal action.   Tiffany is further informed and believes that during the period of April, May and June 2003, Hutton headed a result-oriented investigation into Abbate's and Yosemite Chevron's false and fabricated allegations at their behest and at Spencer's and Abbate's direction.   Plaintiff is further informed and believes that Hutton, Spencer and Abbate participated in this 'investigation.'

> 24.   The following facts are now apparent concerning the specifics of the false and fabricated investigation undertaken by the defendants.   Abbate, with the assistance and

advice of Hutton, Spencer, and other
defendants, fabricated and manipulated
Yosemite Chevron business records to support
his baseless allegations.  Abbate, Hutton,
Spencer, and other defendants also downplayed
and distorted the fact that Yosemite Chevron
at all times had a video surveillance system
that would have depicted an employee taking
cash from the store register and, indeed, had
in the past provided the evidence that led to
Wilson's ultimate firing for stealing a
lottery ticket.  Nor surprisingly, no
videotapes depicting Tiffany engaging in any
dishonest activity were ever disclosed.
Abbate also acted as an investigator on his
own case, and, on or about June 4, 2003
interviewed another Yosemite Chevron
employee, Alejandro Aceves ..., with Hutton
initially surreptitiously observing.  During
that interview, Abbate and Hutton, at
Spencer's direction, coerced Aceves into
saying that Tiffany had taught him how to
steal from Yosemite Chevron, a fact not
disclosed by any of the defendants until
Aceves admitted it in open court during
Tiffany's criminal trial.  Even further,
Abbate and Hutton, at Spencer's direction,
promised Aceves consideration for falsely
implicating Tiffany.  Overall, it took
Abbate, Hutton, Spencer and other defendants
approximately three months to 'make' a case
against Tiffany that could be filed.

25.  Abbate directed his false and fabricated
allegations to the Office of the District
Attorney, instead of the Merced Police
Department, the law enforcement agency with
primary jurisdiction, because Abbate had a
prior personal relationship with Spencer.
Indeed, Spencer recently resigned his
position in disgrace because of numerous
scandals involving his misusing his official
position for his personal interest and gain.
Records indicate that Spencer directed and
routed Abbate's and Yosemite Chevron's
complaint not to the local law enforcement
agency with primary jurisdiction, as would
typically be the case, but instead to Hutton,
a supervising investigator from his office.
Moreover, in conducting, along with Abbate,
the false and fabricated investigation,

4

Hutton acted at all times at Spencer's direction.

26.  On June 23, 2003, Tiffany was charged with embezzlement in violation of California Penal Code § 503.  Tiffany was booked on these charges on August 7, 2003.  The allegations underlying this baseless and fabricated criminal proceeding were that Tiffany embezzled sums herself and also instructed and advised Aceves on how to embezzle funds from Yosemite Avenue Chevron. Indeed, it was alleged that Tiffany was personally responsible for embezzling in excess of $12,000 and that Aceves was responsible for embezzling in excess of $19,000.  In Merced County, it is not uncommon for those convicted of embezzlement to be incarcerated upon conviction, and Tiffany was apprized of this fact at the outset of the criminal proceedings.

27.  The allegations against Tiffany in this regard are completely without any reliable evidentiary support and are contrary to the truth.  Over the period of time where this embezzlement activity is alleged to have occurred, there is no corresponding drop in income or inventory at Yosemite Chevron. Also, there were regular, if not daily, checks of the register and inventory for the purposes of determining if employees were obligated to reimburse Yosemite Chevron, and none of these checks indicated losses consistent with the embezzlement allegations, which would have required Tiffany to have made away with hundreds of dollars per shift. Moreover, contrary to what was alleged, there was no indication that Tiffany was responsible for any of the alleged suspicious activity, since several employees work any given shift and are each able to tend the register at various times.  Additionally, Yosemite Chevron's systems of controls make its records and the allegations of embezzlement highly suspect.  Even further, there was absolutely no indication that Tiffany was ever reported during the subject time period as having any unexplained amounts of cash or suspicious property.

28.   The false, fabricated and baseless allegations of embezzlement against Tiffany were supported by the accountant firm retained on behalf of the prosecution, Cassabon, and the accountants from Cassabon specifically assisting the prosecution, Fung and McIlhatton.   These defendants were brought into this criminal prosecution after the judge who presided over the preliminary examination had expressed doubt and criticism regarding the lack of any objective financial evidence that Tiffany had committed a crime. Even further, it was represented that the Office of the District Attorney was not ready for trial and required a substantial continuance in order to consult with these defendants, so that it might continue proceeding with its case against Tiffany. However, instead of making a serious, objective inquiry into the issues they were retained to examine, these defendants disregarded all of the above-outlined facts showing the embezzlement allegations to be baseless and incredible, as well as the professional standards that are supposed to be followed by accountants engaged to provide litigation services.   As a result, these defendants produced misleading, result-oriented reports that served to add a false air of legitimacy to the embezzlement charges and which permitted said charges to proceed to trial.

29.   As a result of the defendants' wrongful acts, Tiffany was forced to defend herself against these baseless allegations for an extended period of time, all the way up to trial.   Spencer attended a hearing in this criminal proceeding on January 5, 2004 and acknowledged on that date that he had a personal relationship with Abbate.   Moreover, despite Tiffany's lack of a criminal history and the relatively small amount of alleged loss, this criminal proceeding received 'special attention' and a felony resolution was always demanded at Spencer's insistence. Also, despite any credible incriminating facts or evidence, the prosecution persisted in pursuing a felony conviction at Spencer's instruction.

30.   Trial commenced on September 27, 2005.
On October 13, 2005, plaintiff was acquitted
by a Merced County jury.  From the time that
the case was submitted to the jury until the
verdict, only two and one-half hours elapsed.

The FAC alleges a First Cause of Action pursuant to 42

U.S.C. § 1983 against all defendants, alleging in pertinent part:

34.   The defendants' intentional and reckless
acts, as described above, constitute a
deprivation of Tiffany's ... rights under the
Fourth Amendment not to have her liberty
restricted without legal basis, to be
arrested without probable cause, and not to
be prosecuted maliciously without probable
cause.  With respect to these constitutional
violations, as alleged hereinabove,
defendants Yosemite Chevron, Abbco, Abbate,
Fung, McIlhatton, and Cassabon were acting in
joint activity with and/or conspiring with
Spencer and Hutton.

The Third Cause of Action is pursuant to California Civil

Code § 52.1 against the Abbate Defendants and the Cassabon

Defendants and alleges in pertinent part:

45.   The defendants' intentional and reckless
acts, as described above, constitute a
deprivation of plaintiff['s] ... rights,
privileges and immunities under both article
I of the California Constitution and the
Fourth Amendment, specifically, her rights
not to have her liberty restricted without
legal basis, to be arrested without probable
cause, and to be prosecuted maliciously
without probable cause.  The defendants'
interference with these constitutional rights
was accomplished by means of force, coercion,
and intimidation, and/or the threat thereof.
Plaintiff clarifies that the defendants'
liability under this cause of action is not
based on the privileged acts of reporting
criminal activity and/or testifying in court,
but, rather, fabricating evidence used to
justify the filing and continuation of
baseless criminal charges, as set forth
hereinabove.

7

The Fourth Cause of Action is for malicious prosecution under California common law against the Abbate Defendants and the Cassabon Defendants and alleges in pertinent part:

> 49.  The defendants' intentional and reckless acts, as described above, caused plaintiff ... to be maliciously prosecuted without probable cause or other legal basis. Plaintiff was acquitted at trial.  Plaintiff clarifies that the defendants' liability under this cause of action is not based on the privileged acts of reporting criminal activity and/or testifying in court, but, rather, fabricating evidence used to justify the filing and continuation of baseless criminal charges, as set forth hereinabove.

B.   CASSABON DEFENDANTS' OBJECTIONS TO BETTANCOURT EXPERT REPORT.

Submitted in opposition to the Cassabon Defendants' motion for summary judgment is what is characterized by Mr. Little as "the declaration report" of John Bettancourt.  Mr. Bettancourt avers:

> 1.  I am a certified public accountant.  My current curriculum vitae has been provided separately.
>
> 2.  I have been retained on behalf of plaintiff Tiffany Fenters in this proceeding.
>
> 3.  My opinions regarding the accounting aspects of this case are set forth in my testimony in the criminal case, People v. Tiffany Fenters, which I incorporate herein by reference.  Those opinions remain unchanged.  I based those opinions on a review of the accounting materials provided and made available by the prosecution in the underlying criminal case.  I reviewed those materials at length, and I understand that my related work product has also been produced by plaintiff's counsel.

8

> **4.  The spreadsheets provided by defendant Robert Abbate is indicative of false, fabricated and misleading work product for the reasons previously stated in my trial testimony and as reflected in my work product.  The accounting work done by defendants Cassabon & Associates and Victor Fung is also indicative of false, fabricated and/or misleading work product for the reasons largely expressed in my trial testimony and reflected in my work product. The defendants' accounting work is not merely substandard or negligent but instead is reflective of false, fabricated and/or misleading work.**

The Cassabon Defendants object to Mr. Bettancourt's declaration on several grounds.

Defendants object to consideration of Mr. Bettancourt's declaration because it fails to set forth Mr. Bettancourt's qualifications.

Rule 702, Federal Rules of Evidence, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.  *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir.1990).

Defendants complain that Mr. Bettancourt's declaration does not set forth his qualifications, other than to aver that he is a

9

certified public accountant.

Plaintiff responds that "the totality of the materials submitted to the Court, which include Bettancourt's trial testimony in the underlying criminal case and his deposition, more than amply set forth his qualifications as an experienced forensic accountant and certified fraud examiner, as well as the materials he reviewed in support of his opinion in this case," citing Bettancourt's trial testimony at p. 516-531 and his deposition testimony at p. 1-23. Plaintiff cites *Miller v. Corrections Corp. of America*, 375 F.Supp.2d 889, 896 (D.Alaska 2005), in contending that "an expert report may, as do plaintiff's expert's reports, include or make reference to attachments reflecting the expert's opinions."

Defendants' objections to Mr. Bettancourt's declaration on the ground that he is unqualified to render the opinion is baseless. Defendants do not point to any specific evidence that Mr. Bettancourt is not qualified to give his expert opinion as to the accounting methods utilized by Defendants.

Defendants object that Mr. Bettancourt provides no foundation for his opinion in that he does not set forth any of the data he reviewed or any investigation that he undertook in reaching his conclusions; that it does not set forth his methodology; and that his testimony is speculative and conjectural.

However, as Plaintiff notes, Mr. Bettancourt's methodology and foundation is set forth in his trial testimony in the

10

underlying criminal action.  While certain of Mr. Bettancourt's conclusions are conjectural and speculative, these are matters going to the weight of his opinion, not its admissibility.

C.  <u>Governing Standards</u>.

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).  Materiality is determined by the substantive law governing a claim or a defense.  *Id.*  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  *Id.*

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  *T.W. Elec.*, 809 F.2d at 630.  The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial."  *Id.*  The nonmoving party

11

may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint." *Id*.  The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995).  This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff."  *Id*.  The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment."  *Id*.  As explained in *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099 (9th Cir.2000):

> The vocabulary used for discussing summary judgments is somewhat abstract.  Because either a plaintiff or a defendant can move for summary judgment, we customarily refer to the moving and nonmoving party rather than to plaintiff and defendant.  Further, because either plaintiff or defendant can have the ultimate burden of persuasion at trial, we refer to the party with and without the ultimate burden of persuasion at trial rather than to plaintiff and defendant.  Finally, we distinguish among the initial burden of production and two kinds of ultimate burdens of persuasion: The initial burden of production refers to the burden of producing evidence, or showing the absence of evidence, on the motion for summary judgment; the ultimate burden of persuasion can refer either to the burden of persuasion on the motion or to the burden of persuasion at trial.

> A moving party without the ultimate burden of persuasion at trial - usually, but not always, a defendant - has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment ... In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial ... In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact ....

> If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial ... In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything ... If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense ... If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment ... But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion.

210 F.3d at 1102-1103.

D. **CASSABON DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**.

*1.* **Issue No. 1: Plaintiff Cannot Maintain a Claim for Violation of 42 U.S.C. § 1983 Based Upon Absolute Witness Immunity**.

**DUF 1**: The District Attorney's Office

13

filed criminal charges against Plaintiff.

*Plaintiff's Response*: UNDISPUTED.

DUF 2: A preliminary hearing was conducted on or about July 30, 2004, wherein the Court found there was sufficient evidence to support the charges.

*Plaintiff's Response*: UNDISPUTED.

DUF 3: In approximately October of 2004, the District Attorney's Office retained Cassabon Defendants as an expert in this matter.

*Plaintiff's Response*: UNDISPUTED.

DUF 4: The District Attorney's Office asked the Cassabon Defendants to go through the documents to determine if there was anything suspicious.

*Plaintiff's Response*: Disputed.  As defendant Fung testified at the criminal trial, his assignment was "to determine whether there [were] assets misappropriated at the Yosemite Chevron gas station, and if any, estimate the amount of . . . embezzlement." Trial Transcript, p. 320. In his deposition, Fung described his assignment as "[t]racing the money." Fung Deposition, p. 12.

*Court's Ruling*: DUF 6 is DISPUTED.

DUF 5: No one at the District Attorney's Office ever asked or informed Cassabon Defendants that they needed to fabricate evidence or that the source documents were fabricated.

*Plaintiff's Response*: Disputed, since the source documents themselves revealed this information.  In

14

Bettencourt's expert report, he declared that the spreadsheet
provided by defendant Robert Abbate and the work product of
Cassabon were indicative of false, fabricated and/or misleading
work product Bettencourt opined that the defendants' accounting
work was not merely substandard or negligent but instead is
reflective of false, fabricated, and/or misleading work. See
Bettencourt Report, Exhibit A. In his deposition, Bettencourt
confirmed his report and further testified that Abbate's and
Cassabon's work product was misleading and misstated the
evidence. See Bettencourt Deposition, pp. 33, 38, 78, 97.
Bettencourt testified that it was not reasonable or in good faith
to attribute all of the voids on a particular shift to a specific
employee. Bettencourt Deposition, p. 157-158, 161. Both Abbate's
spreadsheet and Fung's report were similar in this respect.
Bettencourt Deposition, p. 160, 161. Bettencourt is of the
opinion that these actions could raise an inference of bad faith
that could be found by a jury. Bettencourt Deposition, p. 163.

   *Court's Ruling*: DUF 5 is DISPUTED.  That
Plaintiff's expert, Mr. Bettancourt, opines that Mr. Fung's
analysis was flawed to the extent no reasonable accountant would
attribute all voids is indicative of bad faith, does not
establish that anyone at the District Attorney's Office asked or
informed Mr. Fung to fabricate evidence against Plaintiff or
informed Mr. Fung that the source documents underlying Mr.
Abbate's spreadsheet or Mr. Fung's report were fabricated, i.e.,
invented or made up.  This requires analysis of whether the

District Attorney's investigator examined the materials and ignored the problems of knew the "evidence" was fabricated.

**DUF 6**: None of the Abbate Defendants ever asked or informed the Cassabon Defendants that they needed to fabricate evidence to support the case against Plaintiff or that the source documents were fabricated.

*Plaintiff's Response*:  Disputed on the same grounds stated in response to DUF 5.

*Court's Ruling*: DUF 6 is DISPUTED for the same reason DUF 5 is disputed.

**DUF 7**: In analyzing the matter, the Cassabon Defendants analyzed the frequency of voided transactions in relationship to the total amount of sales transactions among the various employees.

*Plaintiff's Response*: UNDISPUTED.

**DUF 8**: The Cassabon Defendants decided on the methodology to be utilized.

*Plaintiff's Response*: Disputed.  Fung testified in his deposition that the first thing he did after Cassabon's retention was to meet with defendant Hutton and the then assigned prosecutor, James Swanson. Fung Deposition, p. 18. During a one hour meeting, Fung was told that the prosecution suspected that Fenters was stealing money by voiding transactions. Fung Deposition, p. 18.  Fung was told the prosecution wanted him to analyze the pay point reports, a box of which he received on that occasion. Fung Deposition, p. 20. Fung

also received Hutton's report which had Abbate's spreadsheet as an attachment. Fung Deposition, pp. 19, 22. Fung was told the attachment was a spreadsheet prepared by Abbate himself. Fung Deposition, p. 22. Overall, Fung's approach was similar to the Abbate's spreadsheet approach. Bacciarini Deposition, p. 14. Also disputed, to the extent that it implies a good faith methodology was utilized. In Bettencourt's expert report, he declared that the spreadsheet provided by defendant Robert Abbate and the work product of Cassabon were indicative of false, fabricated and/or misleading work product Bettencourt opined that the defendants' accounting work was not merely substandard or negligent but instead is reflective of false, fabricated, and/or misleading work. See Bettencourt Report, Exhibit A.  In his deposition, Bettencourt confirmed his report and further testified that Abbate's and Cassabon's work product was misleading and misstated the evidence. See Bettencourt Deposition, pp. 33, 38, 78, 97.  Bettencourt testified that it was not reasonable or in good faith to attribute all of the voids on a particular shift to a specific employee. Bettencourt Deposition, p. 157-158, 161. Both Abbate's spreadsheet and Fung's report were similar in this respect. Bettencourt Deposition, p. 160, 161. Bettencourt is of the opinion that these actions could raise an inference of bad faith that could be found by a jury. Bettencourt Deposition, p. 163.

     *Court's Ruling*: DUF 8 is DISPUTED. Plaintiff presents evidence that the Cassabon Defendants were

influenced by the District Attorney's investigation and Abbate spreadsheet in the methodology they used in preparing their report; receipt of the Abbate spreadsheet, advisement of the scope of the Cassabon Defendants' retention, and a similarity of methodology in the opinion of the prosecutor does not constitute evidence raising a genuine issue that the Cassabon Defendants did not decide on the methodology.

**DUF 9**: On approximately October 31, 2004, the Cassabon Defendants generated a report.

*Plaintiff's Response*: UNDISPUTED.

**DUF 10**: On or about October 7, 2005, Defendant Victor Fung of Cassabon & Associates testified in the criminal trial.

*Plaintiff's Response*: UNDISPUTED.

**DUF 11**: Plaintiff never filed any motion to exclude and/or strike the report and testimony of the Cassabon Defendants.

*Plaintiff's Response*: UNDISPUTED.

**DUF 12**: Plaintiff never requested a special admonition or instruction based on the testimony and report of the Cassabon Defendants.

*Plaintiff's Response*: UNDISPUTED.

**DUF 13**: Plaintiff had the opportunity to cross-examine Mr. Fung, introduce her own expert testimony and comment on the evidence during closing argument.

*Plaintiff's Response*: UNDISPUTED.

**DUF 14**: Plaintiff's only interaction with the Cassabon Defendants was her receiving a copy of the report from her counsel and her being present during Mr. Fung's testimony.

*Plaintiff's Response*: UNDISPUTED.

**DUF 15**: Since the trial, Plaintiff has had no interaction with the Cassabon Defendants.

*Plaintiff's Response*: UNDISPUTED.

2.   **Issue No. 2: Plaintiff Cannot Maintain a Claim for Violation of California Civil Code § 52.1 Because She Cannot Meet the Requisite Elements**.

**DUF 16**: The Cassabon Defendants incorporate by reference Facts Nos. 1-15 as if fully set forth herein.

**DUF 17**: Except for the alleged content of their Court testimony, the Cassabon Defendants never made any threatening remarks or gestures toward Plaintiff.

*Plaintiff's Response*: Disputed.  As a result of Abbate's and the other defendants' misconduct, Fenters was threatened with the prospect of conviction and incarceration. See Plaintiff's Deposition, p. 401-402. Indeed, the lead prosecutor testified that he would have indeed sought to incarcerate and seek full restitution against Fenters had she been convicted. See Bacciarini Deposition, p. 64-66.

*Court's Ruling*: DUF 17 is UNDISPUTED. Although the accountant's report and testimony is allegedly based on false or misleading data, such conduct does not amount to threatening remarks against Plaintiff.

19

**DUF 18**: The Cassabon Defendants never touched or made physical contact with Plaintiff.

*Plaintiff's Response*: UNDISPUTED.

**DUF 19**: Except for the alleged content of their Court testimony, the Cassabon Defendants never threatened Plaintiff.

*Plaintiff's Response*:  Disputed on the same grounds as stated in response to DUF 17.

*Court's Ruling*: DUF 19 is UNDISPUTED.

**DUF 20**: Except for the content of their Court testimony, Plaintiff never felt intimidated by the Cassabon Defendants.

*Plaintiff's Response*: Disputed on the same grounds as stated in response to DUF 17.

*Court's Ruling*: DUF 20 is DISPUTED. Plaintiff is entitled to attest to her own state of mind, which Defendants can dispute.

3.   Issue No. 3: Plaintiff Cannot Maintain a Claim for Violation of California Civil Code § 52.1 Because Such Claim is Barred by Defenses Under California Civil Code § 47.

**DUF 21**: The Cassabon Defendants incorporate by reference Facts Nos. 1-20 as if fully set forth herein.

**DUF 22**: The Cassabon Defendants provided a copy of its report to the District Attorney's Office pursuant to its retention.

*Plaintiff's Response*: UNDISPUTED.

**DUF 23**: The Cassabon Defendants testified at trial at the request of the District Attorney's Office.

*Plaintiff's Response*: UNDISPUTED.

    4.  <u>Issue No. 4: Plaintiff Cannot Maintain a Claim for Malicious Prosecution as She Cannot Meet the Requisite Elements</u>.

**DUF 24**: The Cassabon Defendants incorporate by reference Fact Nos. 1-23 as if fully set forth herein.

**DUF 25**: The Cassabon Defendants were not retained until after the preliminary hearing.

*Plaintiff's Response*: UNDISPUTED.

**DUF 26**: From the commencement of the action until its conclusion, the District Attorney's Office had the sole discretion whether to prosecute or dismiss the action.

*Plaintiff's Response*: Disputed, to the extent that Bacciarini testified that Cassabon's analysis permitted the case to proceed to trial to the extent that it confirmed Abbate's spreadsheet analysis. Bacciarini Deposition, p. 70. The Cassabon defendants thus did have an influence over the case, which was the result of their improper and bad faith actions as demonstrated elsewhere herein.  Further disputed, as the evidence shows these actions were unduly influenced by Abbate's misrepresentations.  The prosecution relied on Abbate's operating in good faith in proceeding to a preliminary hearing and trial. Bacciarini Deposition, p. 87-88. However, Abbate misrepresented to Hutton that only one employee worked on the cash register in a

21

given shift, although he knew the opposite was true on a daily basis. Hutton Deposition, p. 20, 74; Abbate Deposition, p. 81, 99. Indeed, employees' log on codes to the cash register were typically the last four digits of their phone numbers, and the phone numbers of employees were posted in the store. Abbate Deposition, p. 85. Abbate did not expect employees to review their shift reports on a line by line basis to ensure they were responsible for each transaction. Abbate Deposition, p. 90-91. Abbate also never told Bacciarini that more than one employee could have worked on the cash register during a given shift. Bacciarini Deposition, p. 16. Abbate reiterated this misrepresentation at trial, only later acknowledging during trial on cross examination that voids could not necessarily be linked to a particular employee, as opposed to a particular shift. See Preliminary hearing Transcript, p. 8, 17; Trial Transcript, p. 242. Hutton would have considered it important to know that actually multiple employees could work on the register in a given shift. Hutton Deposition, p. 21. Hutton would have considered this important because it would have made the task of identifying a particular employee who committed wrongdoing more difficult. Hutton Deposition, p. 22.  Until the time the Cassabon firm was retained after the preliminary hearing, the District Attorney's Office relied on Abbate to review the financial information pertinent to the case against Fenters. Hutton Deposition, p. 33-34. Abbate's financial analysis was one of the reasons that Hutton submitted the case against Fenters for filing. Hutton

Deposition, p. 82.   Indeed, the Abbate spreadsheet was the only financial evidence then available in a prospective financial crime case. Hutton Deposition, pp. 82-83.   Abbate conceded on cross-examination at the preliminary hearing that the voids attributable to Fenters were overstated in his spreadsheet. See Preliminary Hearing Transcript, pp. 52-59. Abbate also conceded that certain entries in his spreadsheet appeared to be entered wrongly, and he spent no time reviewing the initial draft spreadsheet he prepared.   See Preliminary hearing Transcript, pp. 60-61; Abbate Deposition, p. 60, 64. Abbate also attributed certain shifts to Fenters, even though the underlying pay point reports did not contain her genuine signature. See Trial Transcript, pp. 491-492.   Abbate also represented to Hutton that he had contact with another anonymous employee, who turned out to be Robert Wilson, around the time of Tiffany's separation from employment who first provided information regarding the alleged embezzlement, but Abbate did not tell Hutton that Wilson had been fired in December 2002 for stealing from Fenters.   Hutton Deposition, p. 72, 92-94; Trial Transcript, p. 488. Abbate continued his pattern of misrepresentations at the preliminary hearing and trial by again merely referring to Wilson as an "exemployee." See Preliminary Hearing Transcript, p. 41; Trial Transcript, p. 213.   There never was an anonymous employee, and Abbate was aware of Wilson's firing at all pertinent times. See Abbate Deposition, p. 44-45, 97. Hutton would have considered this information important to include in his investigation

23

report. Hutton Deposition, p. 90-91.  Abbate also initially told
Hutton that he had cut Fenters hours beginning in January 2003
because he suspected she was stealing from his business. See
Hutton's Investigative Report, Exh. B to Fung. Decl., pp. 2.
Abbate did not concede until trial that Fenters' hours had
not been cut during this time period. See Trial Transcript, pp.
235-236. Indeed, even after Aceves first admitted stealing in
March 2003, Abbate only believed that he was dealing with a petty
issue. Abbate Deposition, p. 102.  Abbate also did not provide
any tax returns or other financial documents reflecting a drop in
revenues during the time when the embezzlement was allegedly
occurring. Hutton Deposition, p. 22. Abbate also did not provide
Hutton with any videotapes from the register area. Hutton
Deposition, p. 23. This is further circumstantial evidence of his
intent to conceal the truth and unduly influence the criminal
proceedings against Fenters.  The record also shows that the
District Attorney's Office did no independent investigation that
would have permitted it to exercise its discretion in any genuine
and autonomous manner. Spencer acknowledged, although it was not
done in this case, that his office commonly sought the assistance
of a forensic accountant or fraud examiner during the
investigation stage of a case. Spencer Deposition, p.56. Indeed,
Hutton conceded at trial that he did nothing to corroborate
Aceves' statement and Abbate's spreadsheet, even though he knew
Abbate was not an accountant and that confessions are not always
the full truth. See Trial Transcript, pp. 377-378, 401-404.

Hutton never did an independent analysis of the Abbate spreadsheets. Bacciarini Deposition, p.22; Abbate Deposition, p. 108. Hutton also never tested the store surveillance system himself, even though the system would depict money taken from the register by an employee. Hutton Deposition, p. 24.  Hutton never took any steps to obtain any financial information pertaining to Fenters.  Hutton Deposition, p. 28-29; Trial Transcript, pp. 443. Hutton did not attempt to speak with Fenters' parents as part of his investigation, even though there was an allegation that Fenters had been "cut off" by them and therefore had a motive to steal. Hutton Deposition, p. 30. (Fenters father, Virgil Fenters, refuted this allegation at trial. See Trial Transcript, p. 418.) Hutton also never obtained any shift records that corroborated the allegation that Fenters' hours were cut in February 2003 due to her being suspected of stealing. Hutton Deposition, p. 71. Hutton "assumed there was a friendly connection between Fenters and Aceves but made no effort to confirm that through investigation, i.e., phone records, or other Yosemite Chevron employees, Hutton Deposition, p. 31. Hutton also never asked for specifics regarding where Aceves and Fenters were when Fenters allegedly taught him to do illegal voiding. Hutton Deposition, p. 31-32. Hutton never investigated any information suggesting that Abbate was a drug user, although it was provided by the defense during discovery and Hutton acknowledges that such matters can have a bearing on a witness' credibility in a case involving alleged financial loss. Hutton Deposition, p. 83-84; Bacciarini

Deposition, p. 88.   Hutton never asked Aceves if he had prior cash register experience. Trial Transcript, p. 391. Hutton never investigated how many employees worked or could use the register in a given shift. Trial Transcript, p. 393.   The evidence also shows that Abbate was part of the District Attorney's investigative team for purposes of Fenters' criminal case. Hutton acknowledges that Abbate was assisting in the District Attorney's investigation of the Fenters matter between May 14 and June 4, 2003.   Hutton Deposition, p. 43. Abbate also acknowledges he assisted in the investigation and had his most extensive contacts with Hutton during the investigative phase of the Fenters criminal case. Abbate Deposition, p. 104, 124.   Hutton testified an interview protocol was set up between Abbate and himself with respect to the June 4, 2003 interview of Aceves. Hutton Deposition, p. 42-43.   Abbate also set up the June 4, 2003 interview with Aceves. Hutton Deposition, p. 44. Abbate actually conducted the first part of that interview, which was done in conformity with guidelines provided by Hutton.   Hutton Deposition, pp. 44-45; Abbate Deposition, p. 109-110.   Abbate provided an additional eight months of financial analysis at the District Attorney's request. Hutton Deposition, p. 44; Abbate Deposition, p. 79. Hutton spent approximately 20 hours doing his work on the Fenters case, while Abbate worked 35 hours, not including time he spent assisting in interviews at Hutton's direction. Hutton Deposition, p. 57; Abbate Deposition, p. 61-62. All of Hutton's investigation is reflected in his initial and

follow up reports. Hutton Deposition, p. 57.  Bacciarini, the lead prosecutor at the preliminary hearing and at trial, has as many contacts with Abbate as he did Hutton in preparation for the preliminary hearing. Bacciarini Deposition, pp. 10-11. Additionally, James Swanson, who was the prosecutor handling the case against Fenters after the preliminary hearing until just before it went to trial, told Fenters' attorney that he was not permitted to resolve the case via a misdemeanor petty theft plea. See Virgil Fenters Deposition, pp. 32, 35-36. This is further circumstantial evidence of the District Attorney's compromised status in the Fenters criminal case.

*Court's Ruling*: DUF 26 is UNDISPUTED. Plaintiff's recitation of evidence is irrelevant and immaterial to the fact that the District Attorney's Office had the sole legal discretion whether to prosecute Plaintiff.  What Plaintiff has not shown is that the Cassabon Defendants had any knowing participation in a scheme to wrongfully and unjustifiably prosecute Plaintiff.

DUF 27: Plaintiff never had any interaction with the Cassabon Defendants prior to receiving their report from her counsel.

*Plaintiff's Response*: UNDISPUTED.

DUF 28: The Cassabon Defendants did not handle this matter any differently because it involved Tiffany Fenters.

*Plaintiff's Response*:  Disputed on the same grounds as stated in response to DUF 5.

27

*Court's Ruling*: DUF 28 is UNDISPUTED. That Plaintiff's expert, Mr. Bettancourt, opines that Mr. Fung's analysis was flawed does not infer that anyone at the District Attorney's Office asked or informed Mr. Fung to fabricate evidence against Plaintiff or informed Mr. Fung that the source documents underlying Mr. Abbate's spreadsheet or Mr. Fung's report were fabricated, i.e., invented or made up. Further, Plaintiff's evidence does not permit an inference that the Cassabon Defendants handled their responsibilities as retained expert for the prosecution any differently merely because their investigation and report involved alleged embezzlement by Plaintiff.

DUF 29: The Cassabon Defendants did not have any malice towards Plaintiff.

*Plaintiff's Response*: Disputed on the same grounds as stated in response to DUF 5.

*Court's Ruling*: DUF 29 is UNDISPUTED. That Plaintiff's expert, Mr. Bettancourt opines that Mr. Fung's analysis was flawed does not infer that anyone at the District Attorney's Office asked or informed Mr. Fung to fabricate evidence against Plaintiff or informed Mr. Fung that the source documents underlying Mr. Abbate's spreadsheet or Mr. Fung's report were fabricated, i.e., invented or made up. Plaintiff presents no evidence from which it may be inferred that the Cassabon Defendants' investigation and report was motivated by malice toward Plaintiff.

1          **5.   Issue No. 5: Plaintiff Cannot Maintain a**

2  **Claim for Malicious Prosecution Because Such a Claim is Barred by**

3  **Defenses Under California Civil Code § 47**.

4          **DUF 30**: The Cassabon Defendants incorporate by

5  reference Fact Nos. 1-29 as if fully set forth herein.

6          **6.   Issue No. 6: Plaintiff Cannot Maintain a**

7  **Claim for Punitive Damages Against the Cassabon Defendants**.

8          **DUF 31**: The Cassabon Defendants incorporate by

9  reference Fact Nos. 1-30 as if fully set forth herein.

10                          **ANALYSIS**

11          **E.   FIRST CAUSE OF ACTION FOR VIOLATION OF 42 U.S.C. §**

12  **1983**.

13      The Cassabon Defendants move for summary judgment as to

14  Plaintiff's cause of action for violation of Section 1983 on the

15  grounds of absolute witness immunity and lack of evidence of

16  conspiracy to fabricate evidence.

17      In *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983), the Supreme

18  Court held that a witness has absolute immunity from liability

19  for civil damages under Section 1983 for giving perjured

20  testimony at trial.  In *Franklin v. Terr*, 201 F.3d 1098 (9th

21  Cir.2000), the Ninth Circuit applied *Briscoe's* immunity to Terr,

22  a psychiatrist called by the prosecution who testified in

23  Franklin's criminal trial based on charges by his daughter,

24  Franklin-Lipsker, that Franklin had murdered a childhood friend

25  twenty years earlier, and who was later sued by Franklin under

26  Section 1983.  Franklin alleged that Terr had conspired with

                              29

others to present perjured testimony at the criminal trial.  The Ninth Circuit held:

> In the instant case, Franklin is attempting to circumvent Terr's absolute witness immunity by alleging that Terr conspired with others to present false testimony.  We are persuaded that allowing a plaintiff to circumvent the *Briscoe* rule by alleging a conspiracy to present false testimony would undermine the purposes served by granting witnesses absolute immunity from liability for damages under § 1983.  Absolute witness immunity is based on the policy of protecting the judicial process and is 'necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.' ... As the Court stated in *Briscoe*, '[a] witness's apprehension of subsequent damages liability might induce two forms of self censorship. First, witnesses might be reluctant to come forward to testify.  And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability.' ... Moreover, as the district court correctly observed, '[a]ny other holding would eviscerate absolute immunity since a witness rarely prepares her testimony on her own.'
>
> Franklin alleges that Terr conspired with Franklin-Lipsker by interviewing her before Franklin's trial and by then incorporating information obtained from those interviews into her own testimony.  Franklin also alleges that Terr provided Franklin-Lipsker 'with a description of the sort of details that would make her testimony more persuasive, which Franklin-Lipsker then incorporated into her continually evolving "recollection" of the Nason murder.'  The ostensible purpose of this conspiracy was to ensure that one person's testimony did not contradict the other's testimony.  But because Terr's alleged conspiratorial behavior is inextricably tied to her testimony, we find that she is immune from damages.  We are not presented with, and do not decide, the question whether § 1983 provides a cause of action against a

> defendant who conspired to present the
> perjured testimony of another but did not
> testify as a witness herself.

201 F.3d at 1101-1102.  *See also Paine v. City of Lompoc*, 265

F.3d 975, 983 (9th Cir.2001):

> Our cases and *Spurlock* [*v. Satterfield*, 167
> F.3d 995 (6th Cir.1999)]*, demonstrate that
> ... absolute witness immunity does not shield
> an out-of-court, pretrial conspiracy to
> engage in non-testimonial acts such as
> fabricating or suppressing physical or
> documentary evidence of suppressing the
> identities of potential witnesses.

     In *Grey v. Poole*, 275 F.3d 1113 (D.C.Cir. 2002), a social

worker submitted a statement to the court in connection with a

child neglect action.  The District of Columbia Circuit held that

Poole was entitled to absolute witness immunity, concluding that

"[i]t does not matter whether Poole's sworn statement was given

in oral or written form; what matters is that her statement was

the equivalent of sworn testimony in a judicial proceeding."  275

F.3d at 1118; *see also Morstad v. Dept. of Corrections & Rehab.*,

147 F.3d 741, 744 (8th Cir.1998)("Because the court directed

Veenestra to evaluate Morstad and to testify at Morstad's

probation revocation hearing, we conclude that Veenestra was

performing functions essential to the judicial process ... and

affirm the district court's determination that Veenestra was

entitled to absolute immunity."  In *Buckley v. Fitzsimmons*, 919

F.2d 1230 (7th Cir.1990), *reversed on other grounds*, 509 U.S. 259

(1993), the Seventh Circuit addressed whether three expert

witnesses had absolute immunity for their pretrial activities of

31

evaluating the bootprint, writing reports, discussing the case

with prosecutors, and preparing to testify.  509 U.S. at 1244-

1245.  The Seventh Circuit held:

> ... We agree with the district court that
> they do.  *Briscoe* holds that the presentation
> of testimony may not be the basis of
> liability, even if the witness deliberately
> misleads the court.  It would be a hollow
> immunity if the aggrieved party could turn
> around and say, in effect: 'True, your
> *delivery* of bad testimony is immunized, but
> preparing to deliver that testimony is not,
> so I can litigate the substance of your
> testimony.'  Substance is exactly what
> *Briscoe* puts off limits.
>
> As expert could violate a suspect's rights
> independently of the litigation.  The expert
> might, for example, break into the suspect's
> home to obtain samples for analysis.
> Absolute immunity would not apply to that
> theft, for the same reason it does not apply
> to prosecutorial infliction of punishment
> without trial.  A non-testimonial expert
> could violate a suspect's rights by 'cooking'
> a laboratory report in a way that misleads
> the testimonial experts.  Experts, like the
> police, 'cannot hide behind [the immunity of]
> the officials whom they have defrauded.' ...
> But nothing in the complaint suggests that
> the three experts hid evidence, as opposed to
> misinterpreting it.
>
> Discussions between the prosecutors and the
> experts violated none of Buckley's rights.
> Preparing to commit slander or perjury is not
> actionable.  The testimony itself is covered
> by immunity.  Buckley makes it clear that the
> testimony is the real gravamen of his
> complaint.  Olsen, he submits, 'wrongfully
> changed his initial opinion'; Robbins was an
> 'utterly disreputable witness-for-hire.'
> Maybe so, but cross-examination rather than a
> suit for damages is the right way to
> establish these things.  Junk science is a
> plague of contemporary litigation, but the
> peddlers of poorly supported theories do not
> expose themselves to liability by doing

research out of court or appearing in more
than one case.

*White v. Frank*, 855 F.2d 956 (2nd Cir.1988)
holds that *Briscoe* does not apply to
'complaining witnesses'.  Buckley contends
that the three experts are in this category,
because but for their opinions the State's
Attorney would not have obtained an
indictment.  The parallel is not apt.  None
of the experts invented the report of a crime
or brought the fable to the state's
attention.  Jeanine Nicarico is dead.  Each
expert was brought into the case by the
prosecutors, who sought to evaluate the
strength of the evidence against Buckley.  We
therefore need not decide whether to follow
*White*.

919 F.2d at 1245.

There is no allegation in the FAC that the Cassabon

Defendants specifically fabricated evidence presented at the

criminal trial.  The FAC alleges that the evidence was fabricated

by Abbate, Hutton and Spencer before the criminal action was

filed against Tiffany.  Paragraph 28 alleges that the Cassabon

Defendants "were brought into this criminal prosecution after the

judge who presided over the preliminary examination had expressed

doubt and criticism regarding the lack of any objective financial

evidence that Tiffany had committed a crime".  Paragraph 28

further alleges:

[I]nstead of making a serious, objective
inquiry into the issues they were retained to
examine, these defendants disregarded all of
the above-outlined facts showing the
embezzlement allegations baseless and
incredible, as well as the professional
standards that are supposed to be followed by
accountants engaged to provide litigation
services.  As a result, these defendants
produced misleading, result-oriented reports

1          that served to add a false air of legitimacy
           to the embezzlement charges and which
2          permitted said charges to proceed to trial.

3      The Court denied the Cassabon Defendants' motion to dismiss

4  the Section 1983 cause of action on the ground of absolute

5  witness immunity:

6              Although this is a very close question, the
               allegations in Paragraph 28 permit an
7              inference that the Cassabon Defendants
               fabricated the evidence they presented as a
8              witness at the criminal trial by "produc[ing]
               misleading, result-oriented reports ...."
9              This is sufficient to withstand the motion to
               dismiss under the standards set forth above;
10             it provides Defendants fair notice of the
               claims against which they must defend.
11             Whether the Cassabon Defendants are entitled
               to absolute witness immunity pursuant to
12             *Briscoe* is a question of fact to be resolved
               at summary judgment or trial.
13

14     In moving for summary judgment, the Cassabon Defendants rely

15 on Plaintiff's Omnibus Discovery Response (Rubin Decl., Ex. H, ¶

16 4):

17             Plaintiff believes that the circumstantial
               evidence shows that the Cassabon firm, as
18             part of the alleged conspiracy, disregarded
               sound accounting practices and even logic in
19             an effort to support and supersede the
               findings of the financial 'investigation' of
20             Robert Abbate himself.  As plaintiff's
               accounting expert, John Bettancourt can
21             expound upon, and as he testified at the
               underlying criminal trial, the Cassabon
22             firm's analysis in this case was so shoddy
               and non-compliant with professional standards
23             and sound accounting practice that it could
               only be explained by a desire not to reach a
24             valid conclusion but instead support the
               false premises of Robert Abbate's
25             'investigation,' which plaintiff contends was
               fabricated, misleading and false.  Therefore,
26             the Cassabon investigation was equally
               fabricated, misleading and false.

                                    34

The Cassabon Defendants argue that the fact that Plaintiff and her expert disagree with the methodology used by the Cassabon Defendants does not mean that they violated Plaintiff's constitutional rights or that their conduct is beyond the scope of absolute witness immunity.  The Cassabon Defendants note they were third parties who investigated, based on their expert engagement, and testified about what they found.  The Cassabon Defendants argue that they are "covered squarely" by *Briscoe* and that there is absolutely no evidence that the Cassabon Defendants participated in the prosecution of Plaintiff in any other way than their role as an expert witness.

Plaintiff responds that her evidence shows that the Cassabon Defendants "did exactly what caused the Court to permit the action against them to proceed past the pleadings, i.e., produce misleading, result-oriented reports during the pretrial stages of the underlying criminal case."  Plaintiff refers to evidence that the lead prosecutor, Mr. Bacciarini, acknowledged that the Cassabon Defendants' reports permitted the case to proceed to trial to the extent they confirmed Defendant Abbate's initial spreadsheet analysis, and that the Cassabon Defendants' work was similar to that of Defendant Abbate's in terms of methodology and approach.  Plaintiff refers to evidence that the Cassabon Defendants were retained by the District Attorney's Office after Defendant Abbate's spreadsheet analysis was ruled inadmissible at the preliminary hearing, making obtaining a supporting opinion of a forensic accountant crucial to continuation of the criminal

case.   Plaintiff refers to Mr. Bettancourt's opinion that the Cassabon Defendants' reports were misleading and could be consistent with a finding that they were prepared in bad faith. Plaintiff refers to Defendant Fung's testimony that he developed no approach distinct from that of Defendant Abbate, did not review any controls of Yosemite Chevron or review to determine if the business records utilized were reliable, and that he relied "without scrutiny upon an obviously misleading premise, i.e., that all of the voids on a single shift could be attributed to a single employee, although he knew otherwise and developed specious means of 'discounting' this knowledge."   Plaintiff contends:

> The collective effect of these facts is more than sufficient to support the allegations that the Court found to be sufficient, and, thus, to preclude summary judgment as well. This is not a case where the Cassabon Defendants are being sued on items covered by witness immunity, trial testimony or preparation therefor.   Instead the record shows they are civil rights defendants because they create false, result oriented reports that even the lead prosecutor acknowledges were central to the continuation of the criminal case to trial.   Morever, the inference of bad faith created by the evidence ... shows that there is a triable issue of fact as to the motive of the Cassabon defendants.

The Cassabon Defendants reply that Plaintiff's contentions do not come within the exception set forth in *Buckley v. Fitzsimmons*, *supra,* 919 F.2d at 1245:

> *Briscoe* holds that the presentation of testimony may not be the basis of liability, even if the witness deliberately misleads the

36

court.  It would be a hollow immunity if the aggrieved party could turn around and say, in effect: 'True, your *delivery* of bad testimony is immunized, but preparing to deliver that testimony is not, so I can litigate the substance of your testimony.'  Substance is exactly what *Briscoe* puts off limits.

As expert could violate a suspect's rights independently of the litigation.  The expert might, for example, break into the suspect's home to obtain samples for analysis.  Absolute immunity would not apply to that theft, for the same reason it does not apply to prosecutorial infliction of punishment without trial.  A non-testimonial expert could violate a suspect's rights by 'cooking' a laboratory report in a way that misleads the testimonial experts.  Experts, like the police, 'cannot hide behind [the immunity of] the officials whom they have defrauded.' ...  But nothing in the complaint suggests that the three experts hid evidence, as opposed to misinterpreting it.

The Cassabon Defendants reiterate that there is no evidence that they undertook any action independent of the criminal litigation. The Cassabon Defendants were retained after the criminal action was filed and the probable cause hearing was conducted to assist in the preparation of trial and to provide trial testimony.

The Cassabon Defendants assert that there is a dearth of evidence to support any allegation that they fabricated evidence. Even if Mr. Bettancount's expert declaration is considered, the Cassabon Defendants refer to Mr. Bettancourt's deposition testimony that he could not opine whether the Cassabon Defendants fabricated evidence, (Bettancourt Dep, 39:22-40:2, 64:17-20, 76:1-4, 97:8-12, 153:23-154:3), that the Cassabon Defendants did not fabricate any of the source documents and accurately

37

reflected the source documents in their report, (Bettancourt
Dep., 55:23-56:2, 77:8-11).  They refer to Mr. Bettancount's
deposition testimony that the analysis by the Cassabon Defendants
may show a suspicion of embezzlement but their report misstated
the probative value based on the lack of internal controls at
Yosemite Chevron.  This evidence, the Cassabon Defendants argue,
is insufficient to create a material issue of fact that they
fabricated evidence.  Again, the Cassabon Defendants cite *Buckley
v. Fitzsimmons, id.*:

> Olsen, he submits, 'wrongfully changed his
> initial opinion'; Robbins was an 'utterly
> disreputable witness-for-hire.'  Maybe so,
> but cross-examination rather than a suit for
> damages is the right way to establish these
> things.  Junk science is a plague of
> contemporary litigation, but the peddlers of
> poorly supported theories do not expose
> themselves to liability by doing research out
> of court or appearing in more than one case.

The Cassabon Defendants reiterate that the absolute witness
immunity doctrine means nothing if the aggrieved party can say
that your misleading testimony is immunized but the preparation
of your misleading testimony is not.

　　　Plaintiff has no evidence that the Cassabon Defendants
fabricated any evidence as described in *Buckley*.  In *Franklin*,
the Ninth Circuit applied absolute witness immunity to
allegations that the witness conspired to present perjured
testimony, i.e., fabricated testimony, and the immunity applied.

　　　The Cassabon Defendants move for summary judgment that
Plaintiff cannot avoid absolute witness immunity by arguing that

they conspired with other Defendants.  *See, e.g., Franklin v. Terr*, *supra,* 201 F.3d at 1102; *Hunt v. Bennett,* 17 F.3d 1263, 1267-1268 (10th Cir.), *cert. denied,* 513 U.S. 832 (1994); *Jones v. Cannon*, 174 F.3d 1271, 1288-1289 (11th Cir.1999).  The Cassabon Defendants further assert that Plaintiff has no evidence that they conspired with other defendants to present false expert witness testimony at Plaintiff's criminal trial.

Plaintiff responds that the Cassabon Defendants "appear to argue that they are not state actors for purposes of Section 1983, but these defendants, like the Abbate defendants, erroneously contend that they can only be found to be state actors on one of the several possible bases, in this instance conspiracy rather than control as argued by the Abbates."

Plaintiff completely misses the Cassabon Defendants' point. They do not move for summary judgment on the ground that they are not state actors; rather, they correctly contend that Plaintiff cannot overcome absolute witness immunity by arguing that the Cassabon Defendants conspired with other defendants to present false expert opinion testimony at Plaintiff's criminal trial. Further, Plaintiff presents no evidence from which such a conspiracy may be inferred.

The Cassabon Defendants' motion for summary judgment as to the First Cause of Action on the ground of absolute witness immunity is GRANTED.[2]

---

[2]This conclusion makes unnecessary resolution of the Cassabon Defendants' motion for summary judgment as to Plaintiff's prayer

39

F.   <u>THIRD CAUSE OF ACTION FOR VIOLATION OF CALIFORNIA CIVIL CODE § 52.1</u>.

The Cassabon Defendants move for summary judgment as to Plaintiff's claim that they violated California Civil Code § 52.1, on the grounds that Plaintiff cannot establish the requisite elements and that the claim is barred by the absolute litigation privilege set forth in California Civil Code § 47,

California Civil Code § 52.1(b) provides that "[a]ny individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (b), may institute and prosecute ... a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured."  Section 52.1(a) provides for an action by the Attorney General, district attorney or city attorney "[i]f a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual ... of rights secured by the Constitution or laws of the United States, or the rights secured by the Constitution or laws of this state ...."

_____

for punitive damages in connection with the First Cause of Action.

40

The Court denied the Cassabon Defendants' motion to dismiss this cause of action:

> The Cassabon Defendants seek dismissal of the Third Cause of Action, contending that there are no allegations in the FAC of any specific threats, intimidation or coercion by the Cassabon Defendants within the meaning of Section 52.1.
>
> In *Jones v. Kmart Corp.*, 17 Cal.4th 329, 334 (1998), the California Supreme Court explained that "section 52.1 does require an attempted or completed act of interference with a legal right, accompanied by a form of coercion." *See also Venegas v. County of Los Angeles*, 32 Cal.4th 820, 843 (2004)("the language of section 52.1 provides remedies for 'certain misconduct that interferes with' federal or state laws, if accompanied by threats, intimidation, or coercion, and whether or not state action is involved.")
>
> Tiffany argues that Section 52.1 "does not require conduct that 'interferes by threats, intimidation, or coercion' with a claimant's exercise or enjoyment of her constitutional rights occur simultaneously with the resultant constitutional violation" and that Section 52.1 does not "require that this conduct play a direct role in bringing about the constitutional violation." Tiffany concedes that no case law addresses these issues specifically in the context of Section 52.1. However, she refers to *McCalden v. California Library Association*, 955 F.2d 1214 (9th Cir.1989)*, cert. denied*, 504 U.S. 957 (1992) as "finding a claim for a violation of California Civil Code § 51.7 sufficient, although it alleged non-contemporaneous intimidating conduct that was not even conveyed directly to the victim".
>
> In *McCalden*, the Ninth Circuit addressed the district court's dismissal with prejudice of the claim by McCalden, a self-described "Holocaust revisionist", under California Civil Code § 51.7 on the ground that the complaint did not sufficiently allege intimidation by threat of violence committed

41

to plaintiff's person or property as required
by Section 51.7.   Section 51.7(a), as amended
in 1984, provided in relevant part:

> All persons within the jurisdiction
> of this state have the right to be
> free from any violence, or
> intimidation by threat of violence,
> committed against their persons or
> property because of their race,
> color, religion, ancestry, national
> origin, political affiliation, sex,
> sexual orientation, age,
> disability, or position in a labor
> dispute.   The identification in
> this subdivision of particular
> bases of discrimination is
> illustrative only rather than
> restrictive.

The Ninth Circuit ruled:

> Liberally construed, the complaint
> contains one allegation of a
> specific threat - the AJC's alleged
> statement to the CLA, 'at the
> urging and request and with the
> knowledge, approval and cooperation
> of Defendants Marvin Hier ... and
> Simon Wiesenthal Center' that if
> the contract with appellants were
> not canceled, "[d]efendant CLA's
> 1984 Annual Conference would be
> disrupted, there would be damage to
> property and the CLA would be
> 'wiped out.'" ... Appellees claim
> that this language can be construed
> only as a threat against the CLA,
> not against the person or property
> of appellant.   They cite *Coon v.
> Joseph*, 192 Cal.App.3d 1269 ...
> (1987), in which the court held
> that the plaintiff, a gay man,
> could not state a § 51.7 claim
> against a bus driver by alleging
> that his lover was verbally abused
> and struck in his presence.   The
> court stated:

> The complaint establishes that no
> violence or intimidation was

42

committed or threatened against
[plaintiff's] person and thus no
cause of action exists in his own
right.  Following [plaintiff's]
argument, any person would have the
right to recover damages for
himself or herself whenever the
rights of any other human being of
similar ... sexual orientation were
threatened.

*Id.* at 1277-78 ....

On a motion to dismiss, all
reasonable inferences are to be
drawn in favor of the non-moving
party ... Appellant alleges that
the appellees intended to disrupt
his presentation by creating a
demonstration that appellees knew
and intended 'would create a
reasonable probability of property
damage and of violence against
Plaintiff and members of Defendant
CLA.' ... In view of all the facts
pled, it is reasonable to infer
that any property damage or injury
threatened could be directed
against appellant, because the
allegations clearly link the
alleged threat to an intent to
disrupt appellant's exhibit and
program.  This case must therefore
be distinguished from *Coon*, because
it can be reasonably inferred from
the complaint that the threatened
violence was directed against
appellant.

Although appellees suggest that the
statute must be read as requiring
the threat to be conveyed directly
to the person threatened, the
statute only requires that the
plaintiff be intimidated by threat
of violence committed against his
person or property.  In construing
a remedial statute, on a motion to
dismiss, in the absence of clear
state court direction, this court
is reluctant to read any

43

unnecessary restrictions into §
51.7.

955 F.2d at 1221-1222.

Tiffany argues that, because Section 52.1
does not require proof of animus against the
plaintiff, "[i]t would therefore make little
sense that the more general Bane Act would
require a closer nexus between the
perpetrator's threatening acts and the
constitutional violation than does the Unruh
Act."  Contending that Section 52.1 is a more
general statute that should be construed more
broadly, Tiffany argues:

[The] allegations that she was for
the duration of the prosecution
against her, subject to a
legitimate threat of prosecution,
i.e., a loss of liberty, her
allegations under section 52.1 are
sufficient.  Indeed, the defendants
by causing plaintiff's prosecution
and raising the prospect of her
imprisonment, committed acts that
were inherently coercive and
threatening.

Although the Cassabon Defendants have the
better of this argument, whether Tiffany's
position that general "possibility of
incarceration" is ultimately sustainable
against them presents a mixed issue of fact
and law that will benefit from factual
development.  Given the standards governing
resolution of a motion to dismiss, the FAC
marginally alleges a claim for violation of
Section 52.1 to require the Cassabon
Defendants' response.

The Cassabon Defendants argue that Plaintiff has no evidence
that they interfered with or attempted to interfere with
Plaintiff's constitutional rights, accompanied by threats,
intimidation or coercion.  The Cassabon Defendants cite *Austin B.
v. Escondido Union School District*, 149 Cal.App.4th 860, 883

44

(2007):

> The word 'interferes' as used in the Bane Act
> means 'violates.' ... The essence of a Bane
> Act claim is that the defendant, by the
> specified improper means (i.e., 'threats,
> intimidation or coercion'), tried to or did
> prevent the plaintiff from doing something he
> or she had the right to do under the law or
> to force the plaintiff to do something he or
> she was not required to do under the law ....

The Cassabon Defendants refer to Plaintiff's deposition testimony that she never had any communication from or physical contact with anybody with Cassabon & Associates or with Victor Fung and that she never felt physically threatened by Victor Fung. The Cassabon Defendants assert that there is no evidence that the Cassabon Defendants' actions, whatever their effect, involved threats, intimidation or coercion.

Plaintiff responds that the evidence shows that the Cassabon Defendants' report was the basis for the continuation of the felony criminal prosecution where Plaintiff faced the prospect of incarceration. Plaintiff refers to Mr. Bacciarini's testimony that the Cassabon Defendants' report enabled him to continue prosecuting the criminal case through trial and that he would have sought incarceration if Plaintiff had been convicted. Plaintiff relies on the Court's Order denying the motion to dismiss and argues that the prospect of incarceration and loss of liberty is inherently intimidating and coercive, despite the lack of any direct, interpersonal contact between Plaintiff and the Cassabon Defendants.

As the Cassabon Defendants note, Plaintiff cites absolutely

45

no case authority in support of her contention and argue:

> If this limited interaction could
> substantiate a claim under Section 52.1 and
> satisfy the requirements of 'threats,
> intimidation or coercion,' then any adverse
> percipient witness or expert witness who
> testifies in any judicial proceeding is
> potentially subject to this statutory claim.

That a plaintiff feels subjectively intimidated by an expert who testifies on behalf of the prosecution in a criminal case does not constitute interference with constitutional rights, accompanied by threats, intimidation or coercion within the meaning of Section 52.1.  The absence of case authority supporting Plaintiff's position is telling.  There was absolutely no contact between Plaintiff and the Cassabon Defendants until Mr. Fung testified as an expert witness at trial.  Even in *McCalden*, an actual threat was made; here, there is no such evidence.  The Cassabon Defendants correctly observe that finding a violation of Section 52.1 under the facts of this case would open the floodgates for liability for any person who is a witness in a criminal trial.

The Cassabon Defendants further move for summary judgment on the ground that speech alone does not support a Section 52.1 claim.

California Civil Code § 52.1(j) provides:

> Speech alone is not sufficient to support an
> action brought pursuant to subdivision (a) or
> (b), except upon a showing that the speech
> itself threatens violence against a specific
> person or group of persons; and the person or
> group of persons against whom the threat is
> directed reasonably fears that, because of

46

> **the speech, violence will be committed against them or their property and that the person threatening violence has the apparent ability to carry out the threat.**

The Cassabon Defendants moved to dismiss the Section 52.1 claim against them in the First Amended Complaint on the ground that the allegations of the FAC are that their speech caused the violation of Section 52.1, not that they threatened or intimidated Tiffany to forestall her from exercising her rights. In denying the motion to dismiss, the Court ruled: "This claim is arguably marginal.  After factual development the court will be able to evaluate the substance of this claim."[3]

Plaintiff argues that summary judgment is not appropriate because "the evidence shows that the Cassabon defendants are all being sued not for mere speech, but rather for the preparation of misleading and false reports that permitted a serious criminal action to proceed to trial ...."

The Cassabon Defendants move for summary judgment on the ground that Plaintiff's claim against them is barred by the litigation privilege set forth in California Civil Code § 47(b).

Section 47(b) bars a civil action for damages based on statements made in any judicial proceeding, in any official proceeding authorized by law, or in the initiation or course of

---

[3]**The Court granted the Cassabon Defendants' motion to dismiss with prejudice the causes of action for false arrest, negligence, intentional infliction of emotional distress, and defamation alleged in the Complaint pursuant to Section 47(b) based on allegations that the Cassabon Defendants "produced misleading, result-oriented reports that served to add a false air of legitimacy to the embezzlement allegations."**

any mandate-reviewable proceedings authorized by law.  The litigation privilege provided in Section 47(b) applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.  *A.F. Brown Elec. Contractor, Inc. v. Rhino Elec.*, 137 Cal.App.4th 1118, 1126 (2006).  Section 47(b) establishes an absolute privilege for such statements and bars all tort causes of action based on them except a cause of action for malicious prosecution.  *Hagberg v. California Federal Bank*, 32 Cal.4th 350, 360 (2004).  Section 47(b) protects false or fraudulent statements or representations made in the course of litigation, *see Rodas v. Spiegel*, 87 Cal.App.4th 513, 519-520 (2001), or in contemplation of litigation, *see Carden v. Getzoff*, 190 Cal.App.3d 907, 912-916 (1987), the filing of a false declaration*, see Cantu v. Resolution Trust Corp.*, 4 Cal.App.4th 857, 886 (1992), and the filing of forged documents.  *See Pettitt v. Levy*, 28 Cal.App.3d 484, 488-489 (1972).  The privilege "is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards."  *Rusheen v. Cohen*, 37 Cal.4th 1048, 1057 (2006).  As explained in *Adams v. Superior Court*, 2 Cal.App.4th 521, 529 (1992):

> The defendant may rely upon the defense of
> judicial privilege, Civil Code section 47,
> provided there is some reasonable connection
> between the act claimed to be privileged and
> the legitimate objects of the lawsuit in

> which that act took place. The privilege is
> broadly applied to protect most publications
> within lawsuits provided there is some
> connection between the lawsuit and the
> publication ... Any doubt as to whether the
> privilege applies is resolved in favor of
> applying it.

The Cassabon Defendants moved to dismiss this claim in the First Amended Complaint pursuant to Section 47(b). The Court denied the motion to dismiss:

> Dismissal on this ground is not appropriate.
> Although the allegations of the FAC suggest
> that the allegations against the Cassabon
> Defendants will be subject to Section 47(b),
> ultimate resolution of this issue presents a
> mixed question of law and fact, including
> whether the Cassabon Defendants' actions had
> collateral purposes which went beyond the
> litigation, to be resolved at summary
> judgment or trial.

The Cassabon Defendants argue that Plaintiff's claim is predicated on Defendant Fung's trial testimony and his expert report: "Clearly, these actions by Mr. Fung fall under the parameters of the litigation privilege, as Mr. Fung took these actions as part of a judicial proceeding to achieve the objects of the litigation."

Plaintiff responds that summary judgment based on Section 47(b) is not appropriate because "the evidence shows that the Cassabon defendants are all being sued not for mere speech, but rather for the preparation of misleading and false reports that permitted a serious criminal action to proceed to trial ...."

In *Block v. Sacramento Clinical Labs, Inc.*, 131 Cal.App.3d 386 (1982), the mother of a deceased infant brought an action

claiming that a county coroner was liable for publishing an injurious falsehood by communicating to the district attorney an allegedly negligently prepared report of the cause of the infant's death.  The Court of Appeal held that the coroner's communication was absolutely privileged under Section 47 since the report was performed and communicated at the request of the district attorney in furtherance of its investigation whether there was probable cause to initiate criminal charges relating to the infant's death.  In *Carden v. Getzoff*, 190 Cal.App.3d 907 (1987), an anesthesiologist brought an action for abuse of process and infliction of emotional distress against an accountant, claiming that the accountant had manufactured false evidence as an expert accounting witness for the anesthesiologist's former wife in a marital dissolution action. The Court of Appeal sustained the trial court's demurrer on the ground of Section 47's absolute privilege.

Here, the Cassabon Defendants were retained by the District Attorney to serve as an accounting expert at trial.  They prepared for trial and Mr. Fung gave trial testimony.  Case law does not support Plaintiff's distinction because the privilege "is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards."  Further, the Court dismissed with prejudice the supplemental state law claims asserted in the Complaint based on

Section 47's absolute privilege.[4]  The Cassabon Defendants are entitled to summary judgment as to the Third Cause of Action pursuant to the Section 47(b) privilege.

The Cassabon Defendants' motion for summary judgment as to the Third Cause of Action is GRANTED.

G.  <u>FOURTH CAUSE OF ACTION FOR MALICIOUS PROSECUTION</u>.

The Cassabon Defendants move for summary judgment as to the cause of action for malicious prosecution.

"To establish a cause of action for malicious prosecution, a plaintiff must demonstrate that the prior action (1) was initiated by or at the direction of the defendant and legally terminated in the plaintiff's favor, (2) was brought without probable cause, and (3) was initiated with malice." *Siebel v. Mittlesteadt*, 41 Cal.4th 735, 740 (2007).

The Cassabon Defendants argue that summary judgment is appropriate because there is no evidence that they commenced the criminal prosecution against Plaintiff or directed it to be filed.

The Cassabon Defendants moved to dismiss the FAC on this same ground.  In denying the motion to dismiss the Court ruled:

> In *Zamos v. Stroud*, 32 Cal.4th 958 (2004), the California Supreme Court ruled that "[c]onfining the tort of malicious prosecution to the *initiation* of a suit without probable cause would be ... without

---

[4]Because of these rulings, it is unnecessary to address the Cassabon Defendants' assertion that they are entitled to summary judgment on the Third Cause of Action on the ground that their actions are privileged under California Civil Code § 47(c).

support in authority or in principle", 32
Cal.4th at 966, and that "an attorney may be
held liable for malicious prosecution for
continuing to prosecute a lawsuit discovered
to lack probable cause."   *Id.* at 970.

Tiffany relies on *Zamos* in contending that
"[o]ne who contributes to the continuation of
an action instituted without probable cause
and acts with malice may be liable for
malicious prosecution."   Tiffany further
asserts that witnesses may be held liable for
malicious prosecution under California law,
citing *Kimmel v. Goland*, 51 Cal.3d 202, 209
(1990) and *Gootee v. Lightner*, 224 Cal.App.3d
587, 591-592 (1990).

Neither *Kimmel* nor *Gootee* involved a claim
for malicious prosecution. However, *Jacques
Interiors v. Petrak*, 188 Cal.App.3d 1363
(1987), is a malicious prosecution case
against an insurance adjuster (Petrak), by a
commercial tenant (Jacques), who was sued for
subrogation by the insurer (Sentry) of a
building damaged by fire, who was also
Petrak's employer.   In rejecting Petrak's
argument that he could not be liable for
malicious prosecution because the suit was
filed after Sentry's attorney, McCaskey, had
conducted his own investigation, the Court of
Appeal noted:

> 'One may be civilly liable for
> malicious prosecution without
> personally signing the complaint
> initiating the ... proceeding.   If
> a person, without probable cause
> and with malice, instigates or
> procures the [action], he is
> liable.' ... '"[I]t is enough if
> [the defendant] was instrumental in
> setting the law in motion and
> caused the [action] to proceed."
> ...' ... '[T]he test of liability
> in an action for malicious
> prosecution is: Was defendant
> actively instrumental ... [or] the
> proximate and efficient cause of
> maliciously putting the law in
> motion[?] ....

> 188 Cal.App.3d at 1371-1372.   *See also Lujan v. Gordon*, 70 Cal.App.3d 260, 264 (1977)("There does not appear to be any good reason not to impose liability upon a person who inflicts harm by aiding or abetting a malicious prosecution which someone else has prosecuted.").

The Cassabon Defendants argue that *Jacques Interiors v. Petrak, supra*, 188 Cal.App.3d 1363, is "readily distinguishable" from the facts in this case:

> Plaintiff alleges that the other defendants fabricated evidence to initiate the lawsuit [sic] against Plaintiff.   The Cassabon Defendants were retained after charges were brought, and prepared result-oriented reports to support the embezzlement charges.   The preparation of result-oriented reports to support charges that have already been filed is vastly different from the fabrication and destruction of evidence that leads to a lawsuit being filed.

In *Petrak*, Petrak was employed by Sentry Insurance Company to adjust a fire loss in a building in which Jacques was a tenant.   Sentry provided fire and liability insurance to the building's owner, Holiday Investment Company.   Petrak retained the services of an independent fire investigator, Robert Lowe.   Shortly after Lowe began his investigation, he met with Petrak at the site and pointed out burn patterns indicating that the fire may have started in an area above Jacques' suite under the control of Holiday.   Lowe told Petrak there was no evidence that the fire had started in an extension cord on the floor of Jacques' suite, as had been suggested by the Los Angeles County Sheriff's Department arson investigator, Sergeant Francis.   Upon receiving this information, Petrak ordered Lowe immediately to

53

cease his investigation and to write a report that would not conflict with the conclusion of Sergeant Francis.  Petrak also directed Lowe to send the 20 photographs Lowe had taken of the fire site separately from the report.  Lowe prepared the report as instructed without indicating that the cause suggested by Sergeant Francis was incorrect, or that his investigation had been stopped prematurely.  The language of the report was couched in such a way that the report could be used to support Sergeant Francis's opinion, even though Lowe totally disagreed with it. In order to protect himself, Lowe sent the report with a cover letter indicating that it was a "preliminary report" and stating that the photographs were separate from the report, "which is not our usual reporting procedure."  Lowe thereafter refused to accept assignments from Petrak.

Petrak forwarded Lowe's report to Sentry without informing Sentry that the report had been written at his direction after he stopped Lowe's investigation.  Sentry did not receive the photographs or the cover letter.  Petrak used Lowe's report as a basis for subsequent communications with Sentry regarding a subrogation claim against Jacques.  When Petrak put Jacques on subrogation notice, he stated: "On the facts of the loss disclosed by our investigation, we believe you are legally liable for the damage."  When the insurance company of another tenant in the building sued Holiday for subrogation and property damage, Sentry forwarded all reports and letters from Petrak to its attorney, John McCaskey, who began preparing a defense for

1  Holiday and Sentry.  When McCaskey learned that a faulty

2  connection had been found on a Southern California Edison Company

3  power pole which might have caused the air conditioner above

4  Jacques's suite to overheat, causing the fire, he retained

5  experts to investigate.  Lowe was also involved in this

6  investigation, which concluded that there was a possible cause of

7  action against Edison.  McCaskey filed cross-complaints against

8  both Jacques and Edison.  Subsequently, when discovery

9  proceedings revealed what Petrak and Lowe had done, Sentry's

10  cross-complaint against Jacques was voluntarily dismissed with

11  prejudice, and Sentry compensated Jacques for the damages it

12  suffered in the fire.  Jacques then brought an action against

13  Petrak and Lowe for malicious prosecution.  At the close of

14  Jacques' case, Petrak's motion for nonsuit was denied.  The jury

15  awarded compensatory and punitive damages against Petrak; Lowe

16  was exonerated.

17  　　　The Cassabon Defendants move for summary judgment on the

18  ground that a malicious prosecution action may not be maintained

19  against a retained expert witness in a criminal proceeding.  The

20  Cassabon Defendants assert that they have not located a single

21  case which has allowed a malicious prosecution claim to go

22  forward against an expert retained in a criminal proceeding.

23  This, they argue, makes sense, because it is the District

24  Attorney, not the expert witness, who files and pursues criminal

25  proceedings against individuals.

26  　　　The Cassabon Defendants did nothing to instigate or procure

55

the criminal prosecution against Plaintiff.  Plaintiff had been held to answer in the Superior Court before the Cassabon Defendants were retained by the District Attorney's Office.  The Cassabon Defendants functioned as an expert witness for the prosecution, no more and no less.  The Court has been cited no authority allowing a malicious prosecution action against a prosecution witness in a criminal prosecution.

The Cassabon Defendants' motion for summary judgment as to the Fourth Cause of Action is GRANTED.[5]

## CONCLUSION

For the reasons stated:

1.   The motion for summary judgment filed by Defendants Victor Fung and Cassabon & Associates, LLP is GRANTED;

2.   Counsel for the Cassabon Defendants shall prepare and lodge a form of order that the rulings set forth in this Memorandum Decision within five (5) days following the date of service of this decision.

IT IS SO ORDERED.

Dated:   December 29, 2010             /s/ Oliver W. Wanger
                                       UNITED STATES DISTRICT JUDGE

_____

[5]This ruling makes unnecessary resolution of the Cassabon Defendants' arguments that they are entitled to summary judgment s to the Fourth Cause of Action because expert witness testimony during a criminal prosecution is a mere "step" or interim proceeding in a prior action, the Fourth Cause of Action is barred by the interested person privilege set forth in California Civil Code § 47(c), or that *Hogan v. Valley Hospital,* 147 Cal.App.3d 119 (1983) and *Johnson v. Superior Court*, 25 Cal.App.4th 1564 (1994) bar the malicious prosecution claim.